IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ZURICH AMERICAN INSURANCE COMPANY, et al. | : : : | |
| v. | : : | Civil No. CCB-06-2055 |
| FIELDSTONE MORTGAGE CO. | : : : | |

## MEMORANDUM

The plaintiffs, Zurich American Insurance Company, American Zurich Insurance Company, and American Guarantee & Liability Insurance Company (collectively "Zurich"), filed a declaratory judgment action seeking a declaration that they have no duty to defend Fieldstone Mortgage Company ("Fieldstone") against alleged violations of the Fair Credit Reporting Act ("FCRA"). Fieldstone moved for partial summary judgment and Zurich responded with a cross-motion for summary judgment. The parties have fully briefed the motions and no hearing is necessary. *See* Local Rule 105.6. For the reasons articulated below, Zurich's motion will be denied and Fieldstone's motion will be granted.

## BACKGROUND

The dispute in this case arises from a lawsuit filed in federal court in Illinois by Jeff A. Rhodes ("Mr. Rhodes"), *Rhodes v. Fieldstone Mortgage Co.*, No. 06-cv-00108 (N.D. Ill. filed Jan. 9, 2006). (Compl. Ex. A.) In his complaint, Mr. Rhodes alleges that Fieldstone improperly accessed and used his and others' credit information, violating FCRA's requirement that access be either consented to or for a permissible purpose.

Mr. Rhodes alleges that in 2005 and during the two years that preceded the filing of his action, he received "prescreened" offers from Fieldstone to refinance his mortgage. In the complaint, Mr. Rhodes claims that the "prescreening" was based on information contained in his consumer credit report, which was accessed without his consent and without a permissible purpose under FCRA (such as the extension of a firm offer of credit). Mr. Rhodes asserts that Fieldstone "obtained or used, or caused to be obtained or used, the consumer report of plaintiff Jeff A. Rhodes and every other person to whom [the offer] was sent without their written permission or a 'permissible purpose.'" (Compl. Ex. A at ¶ 29.) Mr. Rhodes's complaint seeks statutory damages, injunctive relief, attorney's fees, litigation expenses, and cost of suit, based upon Fieldstone's "willful[]" violation of FCRA. (*Id.* at ¶ 30.)

Zurich issued commercial general liability policies ("the policies") to Fieldstone in two consecutive years. The first ran from November 14, 2003 to November 14, 2004 (Policy No. CPO 3673504-00, Compl. Ex. B); the second spanned the same period from 2004-2005 (Policy No. CPO 3673504-01, Compl. Ex. C.) The parties agree that these policies are substantively identical. (Pls.'s Mem. Supp. Summ. J. & Opp'n Def.'s Summ. J. at 2.) The policies dictated that Zurich would "pay those sums that [Fieldstone] becomes legally obligated to pay as damages because of personal and advertising injury . . . caused by an offense arising out of [Fieldstone's] business." (Def's Mot. Summ. J. Ex. 1 at 5, 6.) The policies also mandate that Zurich is obligated to defend Fieldstone against any suit for such injury. (*Id.* at 5.) "Personal and advertising injury" is defined to include injury "arising out of one or more" of several distinct and separate offenses. (*Id.* at 14.) Among these is "[o]ral or written publication, in any manner, of material that violates a person's right of privacy." (*Id.*)

Upon learning of Mr. Rhodes's lawsuit, Fieldstone requested coverage under Zurich's policies. Zurich agreed to defend Fieldstone under a complete reservation of rights, including the right to seek declaratory relief, the right to withdraw from the defense, and the right to seek reimbursement of defense costs.  On August 7, 2006, Zurich filed this declaratory judgment action, requesting a declaration that it owed Fieldstone no duty to defend or indemnify. Fieldstone counterclaimed and sought summary judgment on Zurich's duty to defend under the coverage for "personal and advertising injury." It is this motion, along with Zurich's cross-motion for summary judgment, that is currently before the court.

## ANALYSIS

This case requires the court to determine whether Zurich has a duty to defend Fieldstone in the underlying *Rhodes* litigation.  Zurich argues that the policy's "advertising injury" language does not cover the FCRA violations alleged in *Rhodes v. Fieldstone*, and asserts that, in any event, a policy exclusion applies that would preclude coverage.

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

3

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial." ' *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr.*, Inc., 290 F.3d 639, 644-45 (4th Cir.2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir.1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

The question is to be decided under Maryland law. In Maryland, the duty to defend is considered a fundamental feature of commercial liability insurance policies. See *Brohawn v. Transamerica Ins. Co.*, 347 A.2d 842, 851 (Md.1975)( "Although the type of policy here considered is most often referred to as liability insurance, it is 'litigation insurance' as well, protecting the insured from the expense of defending suits brought against him."). The insurer's duty to defend "is a 'contractual duty arising out of the terms of a liability insurance policy' and is 'broader than the duty to indemnify.'" *Cowan Sys., Inc. v. Harleysville Mut. Ins. Co.*, 457 F.3d 368, 372 (4th Cir. 2006) (quoting *Litz v. State Farm Fire & Cas. Co.*, 695 A.2d 566, 569 (Md. 1997)). The existence of the duty is to be determined by comparing the allegations in the underlying complaint against the insured with the language of the insurance policy. *Utica Mut.*

*Ins. Co. v. Miller*, 746 A.2d 935, 939 (Md. App. 2000) (quoting *Aetna Cas. & Sur. Co. v. Cochran*, 651 A.2d 859, 862 (Md. 1995).

  Whereas the insurer's duty to indemnify only attaches upon liability, the Maryland Court of Appeals has stressed that a duty to defend exists if there is any chance that the allegations of the underlying action fall within the policy's terms: "Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy." *Brohawn*, 347 A.2d at 850 (emphasis in original); *Cowan Sys.*, 457 F.3d at 372; *Warfield-Dorsey Co., Inc. v. The Travelers Cas. & Sur. Co. of Illinois*, 66 F. Supp. 2d 681, 685 (D. Md.1999). If any of the claims in the underlying suit fall within the terms of the policy, the insurer must defend all of the claims until such time as the only claims remaining are those outside of the policy coverage. *Miller*, 746 A.2d at 940. "Doubts as to whether an allegation indicates the possibility of coverage should be resolved in the insured's favor." *Id.* at 940-41. Although Maryland does not follow the rule that an insurance policy is to be construed most strongly against the drafter, it does apply to insurance cases the general maxim of construing contracts against the drafting party. *Cheney*, 556 A.2d at 1138.

  Under Maryland law, whether an insurance company has a duty to defend an insured against a lawsuit is determined by a two-part inquiry: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the action potentially bring the claim within the policy's coverage? *St. Paul Fire & Marine Ins. Co. v. Pryseski*, 438 A.2d 282, 285 (Md.1981); *see also Cowan Sys.,* 457 F.3d at 372. In determining the scope of coverage, the court applies the principles of construction to the policy's coverage

5

grants and exclusions; the test is what meaning a reasonably prudent person would attach to the term. *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985). "The term may be ambiguous if it is 'general' and may suggest two meanings to the reasonably prudent layperson." *Beale v. Am. Nat'l Lawyers Ins. Reciprocal*, 843 A.2d 78, 89 (Md. 2004). If the ambiguity is not resolved by the use of extrinsic evidence, it will be construed against the drafter of the policy. *Cheney*, 556 A.2d at 1138. Moreover, "[i]f there is any doubt as to whether there is a duty to defend, it is resolved in favor of the insured" *Walk v. Hartford Cas. Ins. Co.*, 852 A.2d 98, 106-07 (Md. 2004).

## I. Policy Coverage

A. Right to Privacy

The FCRA legislation was enacted to ensure "that consumer reporting agencies exercise their grave responsibilities with . . . a respect for the consumer's right to privacy." 15 U.S.C. §1681(a)(4) (2005). *See also Safeco Ins. Co. of America v. Burr*, 127 S.Ct. 2201, 2205 (2007) ("Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy."); *Perry v. First Nat. Bank*, 459 F.3d 816, 825 n.2 (7th Cir. 2006) ("[T]he FCRA is designed to protect the privacy of consumers' credit histories. . . ."); *Castro v. First Midwest Bancorp, Inc.*, 427 F.3d 1043, 1045-46 (7th Cir. 2005) ("In an attempt to achieve this balance between consumer privacy and the needs of a modern, credit-driven economy, [FCRA] 'limit[s] the furnishing of consumer reports' to certain statutorily enumerated purposes."); *TransUnion Corp v. FTC*, 245 F.3d 809, 818 (D.C. Cir. 2001) (concluding that the government's interest in enacting FCRA, "protecting the privacy of consumer credit information," was substantial).

In support of its argument that FCRA does not establish a "right of privacy" recognized by the policies, Zurich cites the Fourth Circuit's decision in *Resource Bankshares Corp. v. St. Paul Mercury Insurance Co.*, 407 F.3d 631 (4th Cir. 2005).  In *Resource Bankshares*, the Fourth Circuit concluded that the fact that the Telephone Consumer Protection Act ("TCPA") protected a "privacy" interest was not sufficient to establish a duty to defend.  Rather, a determination must also be made that the policies protected the particular *type* of privacy interest the statute was intended to protect.  *Id.* at 640.  Applying Virginia law, the court determined that the TCPA, which regulated "junk faxes," was concerned with protecting only a consumer's right to seclusion privacy; that is, the right to be left alone.  *Id.* at 641.  As such, any TCPA violation would not be included under an insurance policy provision covering the "making known" of any material that violated a person's right to privacy, because "making known" would implicate only a right to secrecy privacy; that is, the right to keep certain information confidential.[1]

In distinguishing between the two types of potentially affected privacy rights, the court drew a distinction between the *manner* of the advertisement and the *content* of the advertisement.  *Id.* at 641.  ("[The class action complaint in *Resource Bankshares*] is concerned with the manner of the advertisement.  In contrast, the advertising-injury offense part of the policies is exclusively concerned with those types of privacy which, like secrecy, are implicated by *content* of the advertisements.") (internal citation omitted) The Fourth Circuit concluded that the TCPA was intended to protect consumers only from the intrusive nature of junk faxes – not the content of the faxes themselves.

---

[1]In contrast, the Zurich policy applies to "publication, in any manner"; that phrase was not at issue in the *Resource Bankshares* case.

The *Rhodes* complaint, and FCRA, present nearly the opposite situation. It is not solely the manner of the solicitation that forms the crux of Mr. Rhodes's complaint; it is the action that undergirds the message's content: the unauthorized accessing of his credit records. Indeed, the Fourth Circuit cites, as a possible category of privacy interests, "informational privacy, or 'control over the processing - i.e., the acquisition, disclosure and use - of personal information.'" *Resource Bankshares*, 407 F.3d at 640 n.9. As both Zurich and Fieldstone point out, it would be difficult for Mr. Rhodes to prove his case without introducing the content of the letters he received, because in order to prove his FCRA claim, he would have to show that the solicitations did not include a firm offer of credit such that any unpermitted access to his credit records would be forgiven.[2]

B. Publication

The question remains whether the term "publication" encompasses the type of action alleged here with regard to the solicitations allegedly received by Mr. Rhodes and others. The word "publication" is not defined in the policies, and should be given its "customary, ordinary and accepted meaning," unless there is an indication that the parties intended to use the word in a technical sense. *Cheney v. Bell Nat'l Life*, 556 A.2d 1135, 1138 (Md. 1989). The term "publication" can easily be read here to encompass the printing and mailing of written solicitations. *See* Merriam-Webster's Collegiate Dictionary 1006 (11th ed. 2003) (defining "publication" as the act of publishing, or "to produce or release for distribution; specif.: PRINT.").

---

[2] The underlying case in Illinois apparently has been settled. *Rhodes v. Fieldstone Mortgage Co.*, No. 06-C-08 (N.D. Ill. Mar. 8, 2007) (final order approving settlement).

8

It should be noted that the interpretation of publication in this context is not limited by the case law regarding common-law invasion of privacy. The variations on that tort do, in most instances, require a more broad-based dissemination than is alleged in this case. *See Pemberton v. Bethlehem Steel Corp.*, 502 A.2d 1101, 1118 (Md. 1986) (noting that for the tort of publicity of private facts, "the matter disclosed must be . . . made public."); *see also Cambridge Title Co. v. Transamerica Title Ins. Co.*, 817 F. Supp. 1263, 1278 (D. Md. 1992), judgment aff'd, 989 F.2d 491 (4th Cir. 1993) (in suit for false light publicity, "publicity" would consist of a communication "to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.") (quoting Rest. (Second) of Torts §652D). As the drafter of the policy, had Zurich wished to limit its liability for coverage to the definition of "publication" as contained in common-law privacy torts, it presumably could have done so; it did not.

Zurich argues that in order to constitute a publication, the information that violates the right to privacy must be divulged to a third party. Of the circuits to examine "publication" in the context of an "advertising injury" provision, the majority have found that the publication need not be to a third party. *See, e.g.*, *Park University Enterprises, Inc. v. American Cas. Co. Of Reading*, 442 F.3d 1239, 1248-49, 1250 (10th Cir. 2006).[3] While Zurich relies on the Fourth Circuit's conclusion in *Resource Bankshares* that "'making known' implies telling, sharing or otherwise divulging, such that the injured party is the one whose private material is made known, not the one to whom the material is made known," 407 F.3d at 641, it fails to note the difference

---

[3]The *Park* court distinguished *Resource Bankshares* in large part based on the significant difference in policy language, *see* 442 F.3d at 1248 n.5.

in language ("making known" versus "publication, in any manner") and the different purposes of the TCPA and FCRA. In the *Rhodes* complaint, the party whose private material was published and the party who received the published information are one and the same: Mr. Rhodes (along with other members of the putative class).[4] As the Fourth Circuit pointed out, the phrase "making known" implies discovery or a previous ignorance, *Resource Bankshares*, 407 F.3d at 641, which would necessitate disclosure to an unaware third party; "publication" carries no such connotations.

Nor does the phrase "publication, in any manner, of material that violates a person's right to privacy" necessarily require that the published material contain information that is specifically protected by a right to privacy; that is, information that is secret. Here, there is no question that the information that was accessed was secret; as discussed above, one of the purposes of the Fair Credit Reporting Act is to ensure that consumer credit reports are kept private except in certain circumstances. See 15 U.S.C. §1681b (listing permissible purposes for the unconsented release of a consumer's credit report).

It is true there is no suggestion that the letters themselves contained explicitly credit-related information, such as credit scores or payment histories, and Zurich insists that the lack of this type of information is sufficient to exclude the *Rhodes* allegations from the policy. The *Rhodes* complaint, however, does allege that Fieldstone's "prescreening" was designed to "identify persons who have poor credit or have recently obtained bankruptcy discharges, for the

---

[4]Interestingly, the second listed definition in the Oxford English Dictionary for "publication" is "[n]otification or communication to those concerned, or to a limited number regarded as representing the public." *Oxford English Dictionary* online, http://dictionary.oed.com/cgi/entry/50191815.

purpose of targeting them for subprime credit." (Compl. Ex. A at ¶ 18.)  In allegedly accessing Mr. Rhodes's consumer credit report, Fieldstone presumably retrieved Mr. Rhodes's address, along with sufficient credit information to determine that he was prequalified for Fieldstone's offer.   This information, which the *Rhodes* complaint alleges was improperly obtained, was contained in the letters that Mr. Rhodes and the other putative class members received.  Indeed, in the mailing, Fieldstone gave Mr. Rhodes notice that this "'prescreened' offer" was "based on information in your credit report indicating that you met certain criteria." (Compl. Ex. A at 11.)  Contrast this with *Resource Bankshares*, in which the Fourth Circuit noted that "a single, unsolicited page with nothing but a three-word slogan . . . or even a name or an abstract squiggle alone . . . violates the TCPA and triggers the private right of action," but did not constitute "making known to any person or organization written or spoken material that violates a person's right to privacy."  407 F.3d at 642.

When determining FCRA violations, Zurich wishes to segregate Fieldstone's allegedly improper access to Mr. Rhodes's credit information from the alleged mailing of the letters, such that the FCRA violation would be complete once Fieldstone accessed the information, before publication.  Such a division would be inappropriate for two reasons.  First, Mr. Rhodes's complaint alleges that his and others' credit information was "obtained and used" in violation of FCRA, not just "obtained."  Simply put, he is not suing merely because his credit information was improperly accessed; he is suing because that information was used to "prescreen" him and solicit his business.  Second, in order to violate FCRA, a requestor must certify to the consumer credit reporting agency that a permissible purpose exists, before it obtains the consumer report. 15 USC 1681b(f)(2) ("A person shall not use or obtain a consumer report for any purpose unless

11

(1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and (2) the purpose is certified in accordance with section 607 [15 USCS § 1681e] by a prospective user of the report through a general or specific certification.")  That purpose implies use of the information obtained, such as by mailing an offer to the consumer.

## II. Policy Exclusions

The policies contain an exclusion for personal and advertising injury "arising out of oral, written, televised, videotaped, or electronic publication of material whose first publication took place before the beginning of the policy period."[5] (Ex. D at 6.)  Again, any comparison must be limited to the allegations contained in the complaint and the language of the policies; in Maryland, although an insured may introduce extrinsic evidence to determine a duty to defend, an insurer is barred from doing so.  The underlying complaint alleges that Mr. Rhodes and others received the letters "[i]n 2005 and during the two years preceding the filing of this action." (Compl, Ex. A at ¶6.)  The *Rhodes* action was filed on January 9, 2006; two years prior to the filing would put the publication date of the letters as January 9, 2004.  The effective date of the first Zurich policy was November 14, 2003.  Clearly, there is a potentiality that the date of first publication fell well within the time period covered by the Zurich policies.

---

[5]Fieldstone also moved for summary judgment on the issue of the intent exclusion, which precludes coverage for "'Personal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" (Ex. 1).  Zurich did not contest the non-applicability of this exclusion in its Memorandum in Support of Cross-Motion for Summary Judgment.  Because Zurich failed to "'set forth specific facts showing that there is a genuine issue for trial,'" Fieldstone's motion for summary judgment on the non-applicability of the intent exclusion will be granted.  *Bouchat*, 346 F.3d at 525 (alteration in original) (quoting Fed.R.Civ.P. 56(e)).

III. Fees

Fieldstone argues that Zurich is obligated to pay the legal fees and costs associated with defending against this declaratory judgment action; the court agrees. In Maryland, a prevailing insured may recover fees in a declaratory judgment action regarding coverage. *Cohen v. Am. Home Assur. Co.*, 258 A.2d 225, 239 (Md. 1969). This is true whether the declaratory judgment action is brought by the insured or the insurer. *Collier v. MD-Individual Practice Assoc.*, 607 A.2d 537, 542 (Md. 1992). Zurich has a duty to defend Fieldstone under its policies; while it has done so during the pendency of this litigation, and in that sense has not "breached" its obligation, the benefit Fieldstone bargained for would be substantially dissipated if Fieldstone were forced to pay the costs of a suit brought by Zurich seeking to avoid its obligation.

Accordingly, Fieldstone is entitled to recover the fees and costs associated with this litigation as it relates to the duty to defend.

## **CONCLUSION**

For the foregoing reasons, defendant Fieldstone's motion for partial summary judgment will be granted, and plaintiff Zurich's cross-motion for summary judgment will be denied. A separate Order follows.

| | |
|---|---|
| __October 26, 2007__ | _____/s/_____ |
| Date | Catherine C. Blake |
| | United States District Judge |